# EXHIBIT 1



# Real Estate Developers PROtect℠
# Professional Liability Insurance with Cyber Coverage Declarations

**NOTICE: THIS IS CLAIMS MADE AND REPORTED COVERAGE.
PLEASE READ THE POLICY CAREFULLY.**

| **Insurer:** Colony Insurance Company<br>8720 Stony Point Parkway, Suite 400<br>Richmond, VA 23235 | **Producer:** Swett & Crawford<br>50 California St, Suite 2000<br>San Francisco, CA 94111 |
|---|---|
| **Policy Number:** RE4202378-0 | |
| Renewal of Policy Number: Newline | |

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS AND CONDITIONS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

ITEM 1.   **NAMED INSURED** (Name and Mailing Address):
Pine Management Inc
78 Manhattan Avenue
New York, NY  10025

ITEM 2.   **POLICY PERIOD:**      (a) Inception Date:  08/01/2018      (b) Expiration Date: 12/01/2019
Both dates at 12:01 a.m. at the Named Insured's Mailing Address shown  in ITEM 1 above.

ITEM 3.   **COVERED REAL ESTATE DEVELOPMENT SERVICE**

providing asset management, property management, development consulting, and those services as defined in the  Real Estate Developers PROtect? Professional Liability Insurance with Cyber Coverage Form, with respect to both acquired and non-acquired p

ITEM 4.   **LIMIT OF LIABILITY AND DEDUCTIBLE:** INSURING AGREEMENTS

| Limit of Liability:<br>Each **Claim** | Limit of Liability:<br>Aggregate for all **Claims** | Deductible:<br>Each **Claim** | Deductible:<br>Aggregate |
|---|---|---|---|
| $1,000,000 | $1,000,000 | $25,000 | $N/A |

ITEM 5.     **LIMITS OF LIABILITY AND DEDUCTIBLES:** SUPPLEMENTAL EXPENSES

| Expense Event | Limit of Liability: Each **Expense Event** | Limit of Liability: Aggregate | Deductible: Each **Expense Event** |
|---|---|---|---|
| **Crisis Management Expenses** | $100,000 | $100,000 | $0 |
| Appearance at Proceedings | $10,000 | $50,000 | $0 |
| **Disciplinary Proceedings** | $25,000 | $100,000 | $0 |
| Subpoena Assistance | $15,000 | $25,000 | $0 |
| ADA,FHA and OSHA Legal Expense Reimbursement | $25,000 | $25,000 | $0 |
| Supplementary **Cleanup Costs** Coverage | $25,000 | $25,000 | $0 |

ITEM 6.     **PREMIUM:** $33,168

ITEM 7.     **EXTENDED REPORTING PERIOD OPTION(S):**

12 months at 100% of Full Annual Premium      24 months at 185% of Full Annual Premium

36 months at 200% of Full Annual Premium      48 months at 225% of Full Annual Premium

60 months at 250% of Full Annual Premium      72 months at 275% of Full Annual Premium

ITEM 8.     **RETROACTIVE DATE:** 3/1/2016

ITEM 9.     **NOTICE TO THE INSURER:**

| CLAIMS OR POTENTIAL CLAIMS SEND TO: | ALL OTHER NOTICES SEND TO: |
|---|---|
| ARGO PRO US<br>Professional Liability - Claims<br>413 W. 14th Street<br>New York, NY  10014<br>855-225-7204<br>Argoproclaims@argogroupus.com | ARGO PRO US<br>Professional Liability - Underwriting<br>413 W. 14th Street<br>New York, NY  10014 |

ITEM 10.    **POLICY FORM AND ENDORSEMENTS ATTACHED AT ISSUANCE:**

Please see Schedule of Forms and Endorsements, DECSCH, for a complete list of forms.

**THESE DECLARATIONS, TOGETHER WITH THE PROFESSIONAL LIABILITY POLICY COVERAGE FORM(S) AND ANY ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.**

# SCHEDULE OF FORMS AND ENDORSEMENTS

Insured:   Pine Management Inc
Policy Number:  RE4202378-0

Forms and Endorsements applying to and made part of this policy at the time of issuance:

| NUMBER | TITLE |
|---|---|
| PRRE1000DEC-0517 | Real Estate Developers PROTect Professional Liability Policy Declarations |
| DECSCH-0117 | Schedule Of Forms And Endorsements |
| PRRE1001-0617 | Real Estate Developers PROTect Professional Liability Policy |
| U094-0415 | Service Of Suit |
| PR2006-0117 | Professional Services Endorsement |
| PR2017-0117 | Retroactive Date For Specific Coverage |
| ILP001-0104 | U.S. Treasury Department's Office Of Foreign Assets Control (OFAC) Advisory |
| PrivacyNotice-0415 | Privacy Policy |
| SIGCIC-1013 | Signature Page |

# Real Estate Developers PROtect<sup>SM</sup> Professional Liability Insurance with Cyber Coverage

**THIS IS CLAIMS MADE AND REPORTED COVERAGE.**
**PLEASE READ THIS POLICY CAREFULLY.**

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Words and phrases that appear in bold are defined and may be used in the singular or plural, as appropriate; please refer to Section III – Definitions.

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the **Insurer**, and subject to all of the terms and conditions of this policy (including all endorsements hereto), the **Insurer** agrees with the **Insured** to provide insurance as stated in this policy.

SECTION I - COVERAGES

A.   Insuring Agreements:

   1.   Professional Liability

   The **Insurer** agrees to pay on behalf of the **Insured**, **Loss** in excess of the Deductible amount and up to the Limits of Liability shown in Item 4 of the Declarations; provided that such **Loss** results from a **Claim** first made and reported in writing during the **Policy Period** or Extended reporting Period, if applicable, arising out of a **Wrongful Act** committed before the end of the **Policy Period** and on or after the Retroactive Date, if any, shown in Item 8 of the Declarations.

   2.   Cyber Liability

   The **Insurer** agrees to pay on behalf of the **Insured**, **Loss** in excess of the Deductible amount and up to the Limits of Liability shown in Item 4 of the Declarations; provided that such **Loss** results from a **Claim** first made and reported in writing during the **Policy Period** or Extended Reporting Period, if applicable, arising out of a **Privacy Breach**, **Security Event** or **Social Engineering Incident** taking place before the end of the **Policy Period** and on or after the Retroactive Date, if any, shown in Item 8 of the Declarations.

   3.   Contractors Pollution Liability

   The **Insurer** agrees to pay on behalf of the **Insured**, **Loss** in excess of the Deductible amount and up to the Limits of Liability shown in Item 4 of the Declarations; provided that such **Loss** results from a **Claim** first made and reported in writing during the **Policy Period** or Extended reporting Period, if applicable, arising out of a **Pollution Incident** first discovered during the **Policy Period** and on or after the Retroactive Date, if any, shown in Item 8 of the Declarations.

B.   Supplemental Payments

   These supplemental payments will be paid up to the amount shown in Item 5 of the Declarations and in addition to the applicable Limit of Liability shown in Item 4 of the Declarations.

   1.   **Crisis Management Expenses**

   The **Insurer** will reimburse the **Insureds**, in excess of the applicable Deductible shown in Item 5 of the Declarations, **Crisis Management Expenses** resulting directly from any **Wrongful Act, Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident** that takes place during the **Policy Period**.

2. Appearance at Proceedings

The **Insurer** will pay for loss of earnings for the **Insured's** attendance, at the **Insurer's** written request, at a trial, hearing, arbitration or mediation proceeding involving a **Claim** against any **Insured**. The maximum amount the **Insurer** will pay for any one or series of trials, hearings, mediation or arbitration proceedings arising out of the same **Claim** will not exceed $500 per individual **Insured** for each day, or part thereof.

3. **Disciplinary Proceedings**

   a. If, during the **Policy Period**, a **Disciplinary Proceeding** is first brought against any **Insured**, the **Insurer** will reimburse the **Insureds** for reasonable and necessary legal fees and expenses that the **Insured** incurs in the defense of such matter. Such legal fees and expenses do not include any fines, penalties or restitution paid by the **Insured** as part of or to resolve a **Disciplinary Proceeding**.

   b. The **Insurer** will have no duty to defend the **Insured** in any such **Disciplinary Proceeding**.

   c. Any notice given to the **Insurer** by any **Insured** under this subsection will be deemed notice of **Potential Claim**.

4. Subpoena Assistance

   a. If, during the **Policy Period**, an **Insured** first receives a subpoena for documents or testimony arising out of **Real Estate Development Services** performed by any **Insured**, and the **Insured** requests the **Insurer's** assistance in responding to such subpoena, the **Insurer** will reimburse the **Insured** for reasonable and necessary: legal fees and expenses incurred to provide the **Insured** advice regarding the production of documents; costs incurred by the **Insured** to produce  any documents in response to the subpoena; and legal fees and expenses to prepare the **Insured** for sworn testimony and to represent the **Insured** at the **Insured's** depositions;

   provided that:

   (1) the subpoena arises out of a lawsuit to which the **Insured's** are not a party; and

   (2) the **Insureds** have not been engaged to provide advice or testimony in connection with the lawsuit and the **Insureds** have not provided such advice or testimony in the past.

   b. The **Insurer** has no duty to defend the **Insured** in connection with any such subpoena assistance.  Compliance with a subpoena will not be considered a **Claim** or **Disciplinary Proceeding** under the policy and the coverage for any Subpoena Assistance is limited to that provided under this section.

   c. Any notice given to the **Insurer** by any **Insured** under this subsection will be deemed notice of **Potential Claim**.

5. ADA, FHA and OSHA Legal Expense Reimbursement

The **Insurer** will reimburse the **Insured** for legal fees and expenses up to the amount shown in Item 5 of the Declarations per **Policy Period** in responding to each regulatory or administrative action brought directly against the **Insured** by a government agency under the Americans with Disabilities Act of 1990 (ADA), the Fair Housing Act (FHA) or the Occupational Safety and Health Act (OSHA) provided that the regulatory or administrative action:

   a. is first commenced during the **Policy Period**; and

   b. arises out of the performance of **Real Estate Development Services** rendered on or after the Retroactive Date shown in Item 8 of the Declarations.

After the **Insurer** has paid up to the amount shown in Item 5 of the Declarations under this provision, any additional amounts the **Insurer** agrees to pay will be treated as **Defense Costs** and will be subject to the deductible for the **Policy Period** in which the action was first commenced.

The **Insurer** will not be responsible for the payment of any fines or penalties assessed.

Any notice given to the **Insurer** by any **Insured** under this subsection will be deemed notice of **Potential Claim**.

## SECTION II – LIMITS OF LIABILITY AND DEDUCTIBLE

A. Limits of Liability: Insuring Agreements A.1 Professional Liability, A.2 Cyber Liability and A.3 Pollution Liability

1. Limit of Liability, each **Claim** under Insuring Agreements A.1, A.2 and A.3:  The most the **Insurer** will pay for any **Loss** for each **Claim** covered by this policy under Insuring Agreements A.1,  A.2 and A.3 is the amount shown for Limit of Liability in Item 4 of the Declarations.

2. Limit of Liability, aggregate for all **Claims** under Insuring Agreements A.1, A.2 and A.3: The most the **Insurer** will pay for all **Loss** for all **Claims** in the Aggregate covered by this policy under Insuring Agreements A.1,  A.2 and A.3 is the amount shown in Item 4 of the Declarations.

3. **Defense Costs** are part of and not in addition to the Limits of Liability.  Payment of **Defense Costs** by the **Insurer** will reduce, and may exhaust, the Limits of Liability.

B. Limits of Liability: Supplementary Coverages

Supplemental payments under Insuring Agreement B will be paid in addition to the policy Aggregate Limit of Liability shown in Item 4 of the Declarations.

1. Limits of Liability: **Crisis Management Expenses** – The most this **Insurer** will pay for costs for **Crisis Management Expenses** covered under Insuring Agreement B.1 of this policy during the **Policy Period** from each **Wrongful Act**, **Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident** and in the Aggregate are the amounts shown for **Crisis Management Expenses** in Item 5 of the Declarations.

2. Limits of Liability: Appearance at Proceedings: The most the **Insurer** will pay for costs for each such Appearance at a proceeding and in the Aggregate under Insuring Agreement B.2 during the **Policy Period** are the amounts shown in Item 5 of the Declarations.

3. Limits of Liability: Each **Disciplinary Proceeding**: The most the **Insurer** will pay for costs for each such **Disciplinary Proceeding** and in the Aggregate under Insuring Agreement B.3 during the **Policy Period** are the amounts shown in Item 5 of the Declarations.

4. Limits of Liability: Subpoena Assistance: The most the **Insurer** will pay for costs for each such subpoena and in the Aggregate under Insuring Agreement B.4 of this policy are the amounts shown in Item 5 of the Declarations.

5. Limits of Liability: ADA, FHA and OSHA Legal Expense Reimbursement: The most the **Insurer** will pay for costs for ADA, FHA and OSHA Legal Expense Reimbursement under Insuring Agreement B.5 during the **Policy Period** is the amount shown in Item 5 of the Declarations.

6. Limits of Liability: Supplementary **Cleanup Costs** Coverage: The most the **Insurer** will pay for costs for Supplementary **Cleanup Costs** Coverage Insuring Agreement B.6 during the **Policy Period** is the amount shown in Item 5 of the Declarations.

C. Deductible

1. Regarding the coverage provided by this policy under Insuring Agreements A.1 Professional Liability, A.2, Cyber Liability, and A.3. Pollution Liability, the Each Claim Deductible shown in Item 4 of the Declarations applies to each **Claim** and will be paid by the **Insured** as a condition precedent to payment of any **Loss** by the **Insurer**.  The **Insured** must pay the applicable deductible for each **Claim** within 30 days of the **Insurer's** written request regardless of the number of **Claims** covered by this policy. Any Aggregate Deductible amount shown in Item 4 of the Declarations is the most the **Insured** will pay as a deductible for all **Claims** covered by this policy.

2. Regarding the coverage provided by this policy under Insuring Agreement B. Supplemental Coverages, the Each **Expense Event** Deductible shown in Item 5 of the Declarations applies respectively to each **Crisis Management Expense**, Appearance at Proceeding, **Disciplinary Proceeding**, Subpoena, ADA, FHA, OSHA Legal Expense or Supplementary **Cleanup Costs** Coverage event and will be paid by the **Insured** as a condition precedent to payment of any **Loss** by the **Insurer**.  The **Insured** must pay the applicable deductible for each **Claim** within 30 days of the **Insurer's** written request regardless of the number of **Claims** covered by this policy. Any Aggregate Deductible amount shown in Item 4 of the Declarations is the most the **Insured** will pay for all **Claims** covered by this policy.

3. The **Insured's** Deductible obligation for each **Claim** will be reduced by 50%, subject to a maximum aggregate reduction of all Deductibles for all **Claims** of $25,000 if the **Insurer** agrees and the **Insured** consents to the final settlement of a **Claim** during a voluntary mediation.  This reduction does not apply to any **Claim** resolved through court-mandated mediation or voluntary or involuntary arbitration.


SECTION III - DEFINITIONS

A. **Bodily Injury** means physical injury, sickness, disease or death of any person, and any resulting mental injury, mental anguish, emotional distress, suffering, shock, or humiliation.

B. **Claim** means any of the following arising from a **Wrongful Act**:

1. a written demand received by any **Insured** for monetary, non-monetary or injunctive relief, including a written demand that the **Insured** toll or waive a statute of limitations;

2. a civil proceeding against any **Insured** commenced by the service of a complaint or similar pleading;

3. the institution of an arbitration, mediation, or other alternate dispute resolution proceeding against any **Insured**; or

4. as respects Insuring Agreement A.2, a **Privacy Regulatory Action**.

C. **Cleanup Costs** means expenses incurred in the investigation, evaluation, monitoring, testing, removal, containment, treatment, response, disposal, remediation, detoxification or neutralization of smoke, soot, fumes, acids, alkalis, toxic chemicals, asbestos, liquids or gases, waste materials or other irritants, contaminants or pollutants as a direct result of a **Pollution Incident**. Except as provided in Extensions of Coverage 1 Emergency Remediation Costs, coverage for **Cleanup Costs** under this Policy is conditioned upon prior approval of the **Insurer**.

**Cleanup Costs** do not include any expenses detailed in the preceding paragraph incurred after the cleanup is deemed to be complete upon final approval from the supervising governmental authority.

D. **Crisis Management Expenses** means reasonable and necessary expenses, including legal fees, approved by the **Insurer** in its sole discretion, to engage a public relations firm after an **Insured's Wrongful Act**, **Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident**.

E. **Defense Costs** means:

1. reasonable and necessary fees, costs and expenses charged by any lawyer consented to or designated by the **Insurer** to defend any **Insured** against a **Claim**;

2. all other reasonable and necessary fees, costs and expenses resulting from the investigation, discovery, defense, settlement or appeal of a **Claim** as authorized by the **Insurer**; and

3. the cost of a bond or appeal bond, required as a result of a **Claim**, including bonds to release attachments, but only for bond amounts not exceeding the applicable Limit of Liability; however, the **Insurer** has no obligation to apply for, guarantee or furnish any such bond.

**Defense Costs** do not include the remuneration, salaries, overhead, fees or expenses of either the **Insured's** or the **Insurer's** regular employees or officials or any fees or expenses incurred prior to the time that a **Claim** is first made against any **Insured** and reported to the **Insurer**. **Defense Costs** will be paid first and will reduce, and may exhaust, the Limits of Liability shown in Items 4 and 5 of the Declarations.

F.  **Disciplinary Proceeding** means a proceeding before a disciplinary board or similar entity or official to determine violations of disciplinary rules or rules of professional conduct, professional misconduct or other matters relating to licensing and discipline. **Disciplinary Proceeding** does not include charges, investigations or actions filed with a regulatory agency or official, including, without limitation, the Securities and Exchange Commission, the U.S. Patent & Trademark Office or the Internal Revenue Service.

G.  **Expense Event** means any appearance at a proceeding, **Disciplinary Proceeding**, subpoena, regulatory or administrative action, or corporate reputation damage or Supplementary **Cleanup Costs** event that triggers coverage under Insuring Agreements B.1, B2, B.3, B.4, or B.5.

H.  **Information Custodian** means any third party that possesses **Non-public Personal Information** or **Proprietary Business Information** on behalf of the **Named Insured** and which is required to maintain the confidentiality and integrity of that information by a written contract with the **Named Insured**.

I   **Information System** means any electronic device, electronic and paper storage media, as well as any communications networks, including cloud or other multi-tenant storage models.

J.  **Insured** means:

1.  the **Named Insured** and any **Subsidiary**;

2.  any past,  present or future owner, principal, officer, director, partner, stockholder, shareholder, member, manager or employee of the **Named Insured** or any **Subsidiary** for **Real Estate Development Services** rendered on behalf of the **Named Insured** or any **Subsidiary**;

3.  the estate, heirs, executors, administrators, assigns and legal representatives of each of the **Insureds** in the event of the **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this policy;

4.  any **Insured's** legal spouse, including any natural person qualifying as a domestic partner under the provisions of any applicable state, federal or local law in the United States, but only with respect to **Loss**  resulting from  **Real Estate Development Services** of the **Named Insured**;

5.  all joint ventures entered into, but only for liability arising out of **Real Estate Development Services** performed by any **Insured** as a participant in a joint venture project; or,

6.  any employee, intern, volunteer or independent contractor of the **Named Insured** or any **Subsidiary**, but only as respects **Real Estate Development Services** rendered on behalf of the **Named Insured** or **Subsidiary**.

K.  **Insurer** means the insurance company issuing this policy as shown in the Declarations.

L.  **Loss** means a monetary judgment or settlement that an **Insured** becomes legally obligated to pay as a result of a **Claim**, including punitive or exemplary damages where insurable under applicable law.

1.  **Loss** includes:

   a.  **Defense Costs**; and

   b.  **Rectification Costs**; and

   c.  pre and post judgement interest on the entire amount of any judgment which accrues after the entry of the judgment and before the **Insurer** has paid or tendered or deposited in the Court that part of the judgment that does not exceed the policy limit.

   d.  As regards the coverage provided under SECTION I – COVERAGES, Insuring Agreement A.2

Cyber Liability, **Loss** includes the following for which an **Insured** becomes legally obligated to pay as the result of a **Claim** to which this insurance applies:

    (1) **Regulatory Fines And Penalties** if, and to the extent that, such amounts are insurable under the law of the jurisdiction most favorable to the insurability of such **Regulatory Fines And Penalties** provided such jurisdiction has a substantial relationship to the relevant **Insureds**, the **Insurer**, or the **Claim**; and

    (2) **Regulatory Restitution**.

  e. As regards coverage provided under SECTION I – COVERAGES, Insuring Agreement A.3. Contractor Pollution Liability, **Loss** includes **Cleanup Costs** for which the **Insured** becomes legally obligated to pay as the result of a **Claim** for which this insurance applies.

2. **Loss** does not include:

  a. any fines, penalties, taxes or sanctions, whether imposed by law or otherwise (except as provided above with respect to punitive or exemplary damages or **Regulatory Fines and Penalties**);

  b. the return, reduction or restitution of fees or expenses (except as provided above with respect to **Regulatory Restitution**);

  c. amounts which are uninsurable under applicable law; or

  d. the cost of complying with any injunctive, declaratory or administrative relief.

M. **Named Insured** means the person or entity designated in Item 1 of the Declarations and any **Predecessor** of such entity.

N. **Non-public Personal Information** means any of the following information, if not already publicly available:

1. social security number, driver's license or government issued identification number;

2. credit, debit, bank, credit union or brokerage account numbers, balances or account histories;

3. telephone numbers or telephone records;

4. medical records, health insurance identification numbers or other protected health information; or

5. any other non-public information that can be used to identify that individual as specified by a **Privacy Regulation**.

O. **Personal Injury Offense** means:

1. false arrest, humiliation, mental anguish, emotional distress, unlawful detention, false imprisonment, wrongful entry, eviction or other invasion of private occupancy, abusive litigation, abuse of process or malicious prosecution;

2. the publication or utterance of a libel or slander or other defamatory or disparaging material, or a publication or utterance in violation of any individual's right to privacy; or

3. misrepresentation in advertising, infringement of copyright, trademark, service mark, trade dress or trade name.

P. **Policy Period** means the period from the inception date of this policy to the expiration date of this policy, as shown in Item 2 of the Declarations, or its earlier termination date, if any.

Any extension of the **Policy Period** will not result in an increase or reinstatement of the Limit of Liability.

Q. **Pollution Incident** means an alleged or actual discharge, dispersal, release, seepage, migration or escape of smoke, soot, fumes, acids, alkalis, toxic chemicals, asbestos, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any

watercourse or body of water taking place on or after the Retroactive Date, if any, shown in the Declarations:

1. arising from a **Wrongful Act**, or

2. occurring at any location at which the **Insured** is performing **Real Estate Development Services** <<this added with the intent to provide contractors pollution coverage>>

that causes **Bodily Injury**, **Property Damage** or financial loss.

R. **Potential Claim** means:

1. any **Wrongful Act** which might reasonably be expected to give rise to a **Claim** against any **Insured** under the policy;

2. any breach of duty to a client or third party, which has not resulted in a **Claim** against any of the **Insureds**; or

3. receipt of notice of a **Disciplinary Proceeding** or subpoena.

S. **Predecessor** means an individual or entity engaged in **Real Estate Development Services** whose financial assets and liabilities the **Named Insured** is the majority successor in interest.

T. **Privacy Breach** means any of the following arising from a **Wrongful Act** taking place on or after the Retroactive Date, if any, shown in Item 8 of the Declarations:

1. the alleged unauthorized alteration, collection, copying, disclosure, dissemination or viewing of **Non-public Personal Information** or **Proprietary Business Information** in any form, from any source, because of an Insured's failure to protect such information from unauthorized access or unauthorized use;

2. the alleged accidental release or loss of **Non-public Personal Information** or **Proprietary Business Information**;

3. the alleged wrongful collection, use or sale of **Non-public Personal Information** in any form; and

4. an **Insured's** alleged failure to correct the **Non-public Personal Information** of a third party that is stored on the **Named Insured's Information System** once notified by the affected individual or that individual's legal counsel.

**Privacy Breach** includes the **Named Insured's** vicarious liability for the privacy breach of **Non-public Personal Information** or **Proprietary Business Information** in the care, custody and control of an **Information Custodian** to whom the **Named Insured** entrusted that information.

U. **Privacy Regulation** means any current or future statute or regulation applying to the collection, dissemination or storage of **Non-public Personal Information** promulgated by a **Privacy Regulator** including, but not limited to, state breach notice laws, HIPAA, the Hi-Tech Act, the Federal Trade Commission (FTC) Red Flag rules, Gramm-Leach Bliley or the European Union (EU) Data Protection Act.

V. **Privacy Regulator** means any local, state or federal government of the United States, any provincial or federal government in Canada, the European Union or a member state of the European Union.

W. **Privacy Regulatory Action** means the institution of an investigation, an administrative hearing or civil charges by a **Privacy Regulator** under a **Privacy Regulation** arising out of an actual or alleged **Privacy Breach**.

X. **Real Estate Development Services** means the following services performed by or on behalf of any **Insured** in the course of improvement of real property acquired by the **Insured**, whether alone or as part of a partnership, joint venture, syndication, or other arrangement :

1 the construction or renovation of buildings or other structures on such real property, including: conceptual land planning; requesting and securing zoning changes; performing

environmental studies; construction of horizontal infrastructure such as roads and utilities; property tear-down or re-development; creating capital expenditure projections; performing financial management and reporting; obtaining necessary capital, including giving market condition projections, promotion and advertising; determining surface and subsurface conditions; determining cultural and historic conditions; projecting LEED ratings; preparation, transmittal, and awarding of design and construction bid packages; management, coordination, and supervision of design and construction; and identification and obtaining of applicable permits, variances, consents, easements, and other rights;

2.  services performed while acting as a real estate agent, title agent, notary public, mortgage broker, property manager, construction manager, or general contractor, if performed as part of the services as a real estate developer for the same improvement of real property; and

3.  any other services identified as **Real Estate Development Services** listed in Item 3 of the Declarations.

It is further understood that, regarding the coverage provided in this policy under Insuring Agreement A.2, **Professional Service** includes **Technology Services**.

Y.  **Property Damage** means physical injury to tangible property, including all resulting loss of use of that property.

Z.  **Proprietary Business Information** means business records, customer lists, trade secrets or any other non-public information entrusted to an **Insured** under a written contract to protect its confidentiality.

AA  **Rectification Costs** means those expenses incurred by the **Insured** in excess of the deductible to rectify a design defect in any part of the construction works or engineering works for any project for which the **Insured** is responsible for both design and construction, providing:

1.  the **Insured** demonstrates that the actual and necessary costs and expenses arise out of the **Insured's** performance of **Real Estate Development Services**, and

2.  the **Insured** first sought recovery for any **Rectification Costs** from any Professional Liability Coverage that may apply to the entity responsible for the design defect.

BB  **Regulatory Fines And Penalties** means those sums any **Insured** is required to pay as part of the settlement or judgment of a **Privacy Regulatory Action** to which this insurance applies.

CC.  **Regulatory Restitution** means sums deposited into a fund for the purpose of providing compensation to individuals affected by a **Privacy Breach** as part of a settlement or judgment resulting from a **Privacy Regulatory Action**.

DD.  **Security Event** means any of the following arising from a **Wrongful Act** taking place on or after the Retroactive Date, if any, shown in Item 8 of the Declarations:

1.  the **Insured's** inadvertent transmission of malicious computer code to a third party;

2.  the failure to prevent the use of the **Named Insured's Information System** to harm a third party's **Information System** including the failure to prevent the use of the **Named Insured's Information System** to launch a denial of service attack;

3.  the inability of the **Named Insured** or third party to access the **Named Insured's Information System** due to the failure to prevent a denial of service attack, damage from malicious computer code, unauthorized access to or unauthorized use of the **Named Insured's Information System**; or

4.  the corruption, destruction or loss of electronic data held within the **Named Insured's Information System** as the direct result of malicious computer code, a denial of service attack or from unauthorized access to, or unauthorized use of, the **Named Insured's Information System**.

EE. **Social Engineering Incident** means the following arising from a **Wrongful Act** taking place on or after the Retroactive Date, if any, shown in Item 8 of the Declarations:

An **Insured** having transferred, paid or delivered funds or data as a direct result of a fraudulent written instruction, electronic instruction (including e-mail or web-based instruction) or telephone instruction which is intended to mislead an Insured through misrepresentation of a material fact that is relied upon in good faith by such **Insured**.

FF. **Subsidiary** means:

1. any entity in which more than 50% of the outstanding voting securities or voting rights representing the present right to vote for election of directors, officers, any **Insured**,  or any equivalent executives, is owned or controlled by the **Named Insured**, either directly or indirectly on or before the effective date of this policy;

2. any entity after the effective date of this policy by reason of being created or acquired by the **Named Insured** after such date, if the gross revenues of the created or acquired entity for the prior year are equal to or greater than 50% of the annual gross revenues of the **Named Insured** as reflected in the **Named Insured's** most recent audited consolidated financial statement prior to such creation or acquisition; or

3. any entity after the effective date of this policy by reason of being created or acquired by the **Named Insured** after such date, other than as described in subsection 2. above, but such entity will be a **Subsidiary** only for either (i) a period of 30 days from the date such entity was created or acquired by the **Named Insured**; or (ii) until the end of the **Policy Period**, whichever occurs first.

Provided, however, that **Subsidiary** will not mean any entity which is a financial institution, including but not limited to any bank, insurance company, insurance agent/broker, securities broker/dealer, investment advisor, mutual fund or hedge fund.

**Subsidiary** also means any foundation or charitable trust controlled or directly sponsored by the **Named Insured**.

Provided, however, this policy will only apply to **Wrongful Acts** committed or allegedly committed after the effective date an entity becomes a **Subsidiary** and prior to the effective date such entity ceases to be a **Subsidiary**.

GG. **Technology Products** means computer or telecommunications hardware or software, or related electronic product that you develop, create, manufacture, distribute, license, lease or sell to your clients and for whom **Real Estate Development Services** are rendered.

HH. **Technology Services** means:

1. information technology consulting;

2. the administration, analysis, design, engineering, installation, integration, maintenance, management and programming of information systems or networks;

3. the analysis, development, delivery, design and support of business application software;

4. the design, hosting, maintenance, or programming of websites;

5. the distributing, installing, maintaining, marketing, selling and training in the use of electronic or computer related hardware or software; and

6. the assembly, design, development, distribution, installation, licensing, leasing, maintenance, manufacturing, ore repair of the **Insured's Technology Products**.

II. **Wrongful Act** means any actual or alleged act, error, omission or breach of duty by any **Insured** in the rendering of or failure to render **Real Estate Development Services**.  **Wrongful Act** also means an actual or alleged **Personal Injury Offense** by any **Insured** in the rendering of or failure to render **Real Estate Development Services**.

SECTION IV - EXCLUSIONS

This policy does not apply to any **Claim** or **Expense Event**:

A. arising out of a **Wrongful Act**, **Privacy Breach**, **Security Event**, **Social Engineering Incident**, **Pollution Incident** or **Expense Event** occurring prior to the **Policy Period** if, prior to the effective date of the first Architects & Engineers Professional Liability Insurance Policy issued by the **Insurer** to the **Named Insured** and continuously renewed and maintained in effect prior to the **Policy Period**:

   1. any **Insured** gave notice to any prior insurer of any such **Claim**, (including any **Potential Claim** that might lead to such **Claim**), **Wrongful Act**, **Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident**; or

   2. any **Insured** had a reasonable basis to believe that the **Insured** had committed a **Wrongful Act**, violated a disciplinary rule, or engaged in professional misconduct.

B. arising out of any actual or alleged intentional, criminal, dishonest, malicious or fraudulent act, error or omission by any **Insured**.

   This Exclusion does not apply to:

   1. any **Personal Injury Offense** that results from any **Insured's** rendering or failing to render **Real Estate Development Services**; or

   2. any of the **Insureds**, unless such intentional criminal, dishonest, malicious or fraudulent act, error or omission is established by a final adjudication of the **Claim** or a final adjudication in any judicial, administrative or alternative dispute resolution proceeding.

   For purposes of this Exclusion, no such act of one of the **Insureds** will be imputed to any of the **Insureds** who were not aware of and did not participate in such act.

C. arising out of any **Insured's** services or capacity as an officer, director, partner, owner, member, manager or employee of any corporation, partnership, association or any other business enterprise or charitable organization of any kind or nature other than:

   1. the **Named Insured;**

   2. any entity other than the **Named Insured**:
      a. that is managed, or controlled by any **Insured**;
      b. in which any **Insured**, individually or collectively, has an ownership interest in excess of 49%; or
      c. which wholly or partly owns, operates or manages the **Named Insured**.

D. arising out of any actual or alleged violation or breach by any **Insured** of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, Telephone Consumer Protection Act (TCPA), Securities Act of 1933, Securities Exchange Act of 1934, the Racketeer Influenced and Corrupt Organizations Act 18 USC Sections 1961 et seq., the Controlling the Assault of Non-Solicited Pornography and Marketing ACT (CAN-SPAM) of 2003, the Fair Credit Reporting Act (FCRA), Fair and Accurate Credit Transactions Act (FACTA),  or amendments thereto of any of these, or any similar provision of any federal, state or local statute, regulation, ordinance or common law.

   This Exclusion does not apply if any **Insured** is deemed to be a fiduciary solely by reason of **Real Estate Development Services** rendered with respect to any employee benefit plan.

E. arising out of **Bodily Injury** or **Property Damage**.

   This Exclusion does not apply to **Bodily Injury** resulting from a **Personal Injury Offense** or to the extent that any such **Bodily Injury** or **Property Damage** results from any **Insured's** rendering of or failure to render **Real Estate Development Services**.

F. arising out of

1. any **Insured's** actual or alleged liability under any oral or written contract or agreement, including but not limited to express warranties or guarantees; or

2. any actual or alleged liability of others that any **Insured** assumes under any oral or written contract or agreement.

However, this exclusion will not apply to the **Insured's** liability that exists in the absence of such contract or agreement.

In a foreign jurisdiction where the **Insured's** liability to a client is predicated only on contractual liability, item F.1 of this Exclusion does not apply except to the extent that the **Insured** has agreed to pay consequential or liquidated damages.

This exclusion does not apply to liability assumed by the **Insured** in a client contract.

G. made by any **Insured** against any other **Insured**.

H. However, this exclusion does not apply to claims brought by investors who have ownership in the developed property on which a **claim** is brought against the **Insured.**

H. arising out of infringement of patent or misappropriation of trade secret, resulting in unfair competition or restraint of trade law, rule or regulation.

I. arising out of an actual or alleged violation of any anti-trust or price-fixing rule or regulation.

J. arising out of the design or manufacture of any goods or products which are sold or supplied by any **Insured** or by others under license from any **Insured**.  This exclusion does not apply to software sold or supplied by the **Insured** to its client in connection with the **Insured's** provision of other **Real Estate Development Services** for that client.

K. arising out of any **Insured's** employment obligations, decisions, practices or policies as an employer, including but not limited to any **Claim** under worker's compensation, unemployment compensation, employee benefits, or disability benefits law or similar laws.

L. arising out of any actual or alleged discrimination, humiliation, harassment or misconduct, including but not limited to that which is based on an individual's race, religion, color, gender, sexual orientation, national origin, age, disability, or marital status.  This exclusion does not apply to otherwise covered **Claims** brought under the Americans with Disabilities Act, the Fair Housing Act, or any similar state or local law or ordinance.

M. arising out of any actual or alleged failure to procure and/or maintain adequate insurance or bonds

However, this exclusion will not apply to the insured's services in the performance of property management.

N. arising out of any **Insured's** making any payment:

1. without prior receipt of an architect's certificate, where such certificate is required as a condition of payment, or

2. without prior receipt of appropriate waivers or releases of lien from the subcontractors involved, where work or materials have been provided by said subcontractors.

O. arising out of the actual or alleged theft, misappropriation, commingling, or conversion of any funds, monies, assets, or property.

P. arising out of the acquisition of property for resale or other arrangements to obtain monetary gain without making improvements to said property in the course of the Insured's Real Estate Development Services.

SECTION V – COVERAGE EXTENSIONS

1. EMERGENCY REMEDIATION COVERAGE

The **Insurer** will reimburse the **Insured** up to $250,000 for reasonable and necessary **Cleanup Costs** the **Insured** incurs to take immediate action without the prior consent of the **Insurer** in order to abate and/or respond to an imminent and substantial threat in connection with an actual or potential **Pollution Incident**, provided:

a. the **Pollution Incident** results from the **Insured's** performance of or failure to perform **Real Estate Development Services** taking place on or after the Retroactive Date; and

b. the **Pollution Incident** is first discovered by the **Insured** during the policy period and is reported to the **Insurer** in writing as soon as is possible after such discovery, but in any event no later than 10 business days after the **Insured** first discovers such **Pollution Incident**, or the end of the policy period, whichever is earliest.

The **Insurer** will only reimburse the **Insured** for **Cleanup Costs** under this Coverage Extension the **Insurer** deems reasonable and necessary to mitigate the **Pollution Incident** on an emergency basis.

The **Insured** must pay the deductible stated in the Declarations in connection with any payments the insurer makes under this subsection.

Covered **Cleanup Costs** incurred in excess of the $250,000 sublimit noted in this Section shall be treated in the same manner as other covered **Loss**. In any event, **Cleanup Costs** shall be part of, and not in addition to, the Limit of Liability of this Policy.

Any notice given to the **Insurer** under this subsection shall be deemed notice of a **Potential Claim**.

2. EXTENDED REPORTING PERIODS

In the event this policy is cancelled or non-renewed by either the **Named Insured** or the **Insurer**, an **Insured** is entitled to the extensions of coverage shown in this Section.

A. Automatic Extended Reporting Period

An Extended Reporting Period is automatically provided to the **Named Insured** without additional charge. This period starts at the end of the **Policy Period** and lasts for 60 days, or the date another policy for professional liability insurance applicable to the **Named Insured** takes effect, whichever occurs first.

1. There will be no entitlement to this Automatic Extended Reporting Period if cancellation or non-renewal is due to any **Insured's** non-payment of premium or deductible due, or failure to comply with the terms and conditions of the policy, or if the Policy was issued based upon a misrepresentation by any **Insured**.

2. This Automatic Extended Reporting Period will be subject to all the terms and conditions of this policy and will apply to **Claims** first made against any **Insured** and reported to the **Insurer** during the Automatic Extended Reporting Period and that arise out of any **Wrongful Act** that occurred or is alleged to have occurred subsequent to the Retroactive Date, if any, and before the end of the **Policy Period**.

3. The fact that the period during which **Claims** may be reported to the **Insurer** under this policy by way of this Automatic Extended Reporting Period does not in any way increase the Limits of Insurance of this policy.

4. If any other policy of insurance in effect would apply to any **Claims** first made against the **Insured** during the Automatic Extended Reporting Period, then coverage provided under this Automatic  Extended Reporting Period will apply in excess of such other insurance.

B. An Optional Extended Reporting Period is available to the **Named Insured**, but only by an endorsement and for an extra premium charge as shown in Item 7 of the Declarations.

1. The **Named Insured** must give the **Insurer** a written request for the endorsement and pay any premium due within 60 days after the end of the **Policy Period**. The Optional Extended Reporting Period will not go into effect unless the **Named Insured** pays the additional premium promptly when due.

2. The Optional Extended Reporting Period is non-cancellable and starts upon the expiration of the **Policy Period**.

3. All premiums paid for the Optional Extended Reporting Period will be deemed fully earned and non-refundable as of the first day of the Optional Extended Reporting Period.

4. There will be no entitlement to this Optional Extended Reporting Period if cancellation or non-renewal is due to any **Insured's** non-payment of premium or deductible due, or failure to comply with the terms and conditions of the policy, or if the policy was issued based on a misrepresentation by any **Insured**.

5. This Optional Extended Reporting Period will be subject to all the terms and conditions of this policy and will apply to **Claims** first made against any **Insured** and reported to the **Insurer** during the Automatic Extended Reporting Period and that arise out of any **Wrongful Act** that occurred or is alleged to have occurred subsequent to the Retroactive Date, if any, and before the end of the **Policy Period**.

6. The fact that the period during which **Claims** may be reported to the **Insurer** under this extension does not in any way increase the Limits of Insurance of this policy.

C. Nonpracticing Extended Reporting Period

If, during this **Policy Period**, any **Insured** permanently and totally retires or otherwise voluntarily ceases the practice of providing the **Real Estate Development Services** insured by this policy, and has been insured by a Professional Liability Insurance policy issued by the **Insurer** for at least the 7 consecutive years immediately preceding, and the **Insured** is at least 55 years of age, the **Insurer** will, subject to the provisions of paragraphs A. and B. above, issue a Nonpracticing Extended Reporting Period endorsement.

1. This Nonpracticing Extended Reporting Period is provided until such **Insured** resumes the **Real Estate Development Services** insured by this policy, or until the death of such **Insured** in which case paragraph D.1 below, will apply.

2. No additional premium will be charged for this coverage, nor will any premium be refunded.

D. Death or Disability Extended Reporting Period

If during the **Policy Period,** any **Insured** dies from a cause other than suicide or becomes totally and permanently disabled, an extended reporting period is provided until the executor or administrator is discharged or until the disability ends. However, the Death or Disability Extended Reporting Period will never be longer than seven years from the date of death or disability. No additional premium will be charged for this coverage, nor will any premium be refunded.

1. In the event of death, the **Insured's** estate must, no later than 60 days after the end of this **Policy Period**, provide the **Insurer** with written notice that the extended reporting period is desired. This notice must include written proof of the date of death.

2. In the event the **Insured** becomes totally and permanently disabled, the **Insured** or the **Insured's** legal guardian must, no later than 60 days after the end of this **Policy Period**, provide the **Insurer** with written notice that the extended reporting period is desired. This notice must include written proof that the **Insured** is totally and permanently disabled, including the date the disability began, certified by the attending physician. The **Insured** agrees to submit to medical examination(s) by any physician(s) designated by the **Insurer**, if requested.

This extended reporting period is subject to the conditions set forth in paragraphs A. and B. above.

SECTION VI – GENERAL CONDITIONS

A.  Defense, Settlement And Cooperation

1.  The **Insurer** has the right and duty to defend any **Insured** against any **Claim**, even if the allegations of such **Claim** are groundless, false or fraudulent.  The **Insurer** will designate, or, at the **Insurer's** sole discretion, approve counsel chosen by the **Insured** to defend the **Claim**. However, the **Insurer** has no duty to defend any **Insured** against any **Claim** to which this insurance does not apply.

   This policy has provisions whereby the **Insurer** will pay on the **Insured's** behalf certain costs incurred as a result of defending a **Disciplinary Proceeding** or responding to a subpoena for documents or testimony; however the **Insurer** has no duty to defend the **Insured** in any such **Disciplinary Proceeding** or in connection with any such subpoena assistance as shown in SECTION I – COVERAGES, B. Supplemental Payments, item 5. of this policy.

2.  The **Insurer** has the right to make any investigation the **Insurer** deems necessary and, with the **Insured's** consent, make any settlement of any **Claim** covered by the terms of this policy.

3.  The **Insured** will not, except at the **Insured's** own cost, make any payment, admit any liability, settle any **Claim**, assume any obligation or incur any expense, without the **Insurer's** prior written consent, such consent not to be unreasonably withheld.

4.  If the applicable Limit of Liability shown in Items 4 and 5 of the Declarations are exhausted by the payment of **Loss**, then all of the **Insurer's** obligations under this policy will be completely fulfilled and exhausted, and the **Insurer** will have no further obligations of any kind or nature whatsoever under this policy.  If the applicable Limit of Liability shown in the Declarations is exhausted prior to settlement or judgment of any **Claim**, the **Insurer** will have the right to withdraw from further investigation or defense by tendering control of such investigation or defense to the **Insured**, and the **Insured** agrees, as a condition to the issuance of this policy, to accept such tender.

5.   The **Insured** must cooperate with the **Insurer** and assist the **Insurer** in investigating and defending any **Claim** or **Potential Claim** or investigating any event resulting in coverage under Insuring Agreement B: Supplemental Payments.  Upon the **Insurer's** request, the **Insured** must submit to examination and interrogation by the **Insurer's** representatives, under oath if required, and the **Insured** must attend hearings, depositions and trials, and assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits and other proceedings, as well as in the giving of a written statement or statements to the **Insurer's** representatives including investigating and coverage counsel, and meeting with such representatives for the purpose of investigating and defense, including the investigation of coverage issues or defense.  The **Insured** must further cooperate with the **Insurer** and do whatever is necessary to secure and effect any rights of indemnity, contribution or apportionment which the **Insured** may have.

B.  Reporting And Notice

1.  Reporting of **Claims**

   If, during the **Policy Period** or any Extended Reporting Period, any **Claim** for a **Wrongful Act** is first made against any **Insured**, as a condition precedent to the **Insured's** right to coverage under this policy, the **Insured** must give the **Insurer** written notice of such **Claim** as soon as practicable, but in no event later than the later of 60 days after the expiration date or earlier termination date of this policy, or the expiration of any Extended Reporting Period, if applicable.

   Timely and sufficient notice of a **Claim** by one of the **Insureds** will be deemed timely and sufficient notice for all of the **Insureds** involved in the **Claim**. Such notice must give full particulars of the **Claim**, including, but not limited to: a description of the **Claim** and **Wrongful Act**; the identity of the **Insured** and all potential claimants involved; a description of the injury or damages

that resulted from such **Wrongful Act**; information on the time, place and nature of the **Wrongful Act**; and the manner in which the **Insured** first became aware of the **Claim**.

2.  Reporting of **Potential Claims**

If, during the **Policy Period**, any **Insured** first becomes aware of any **Potential Claim**, the **Insured** will give the **Insurer** written notice of such **Potential Claim** with full particulars as soon as practicable thereafter, but in any event before the end of the Policy Period. If such **Potential Claim** later becomes a **Claim** not otherwise excluded by this policy, such **Claim** will be treated as if the **Claim** had been first made during the **Policy Period**.  Full particulars include, but are not limited to: a description of the **Potential Claim**; the identity of the **Insured** and all potential claimants involved; information on the time, place and nature of the **Potential Claim**; the manner in which the **Insured** first became aware of such **Potential Claim**; and the reasons the **Insured** believe the **Potential Claim** is likely to result in a **Claim**.

3.  Notice regarding **Crisis Management Expenses**

If, during the **Policy Period**, a **Wrongful Act, Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident**  occurs, then as a condition precedent to the **Insured's** right to coverage under this policy for **Crisis Management Expenses**, the **Insured** must give the **Insurer** written notice of such **Wrongful Act, Privacy Breach**, **Security Event** or **Social Engineering Incident** as soon as practicable, but in no event later than the expiration date or earlier termination date of this policy.

Such notice must give full particulars of the **Wrongful Act, Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident**, including, but not limited to: a description of the **Privacy Breach** or **Security Event**; the identity of the **Insured** and all potential claimants involved; and the manner in which the **Insured** first became aware of such **Wrongful Act, Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident**.

4.  Notice of **Disciplinary Proceedings** and Subpoenas

If, during the **Policy Period**:

a.  a **Disciplinary Proceeding** is first initiated against any **Insured** and covered by SECTION I – COVERAGES, B. Supplemental Payments, 3. Disciplinary Proceedings; or,

b.  any **Insured** first receives a subpoena covered by SECTION I – COVERAGES, B. Supplemental Payments, 4. Subpoena Assistance;

then as a condition precedent to the **Insured's** right to coverage under this policy, the **Insured** must give the **Insurer** written notice of such **Disciplinary Proceeding** or subpoena as soon as practicable, but in no event later than the end of the **Policy Period**.

Such notice must give full particulars of the **Disciplinary Proceeding** or subpoena, including, but not limited to: a description of the **Disciplinary Proceeding** or subpoena; the identity of the **Insured** and all potential claimants involved; and the manner in which the **Insured** first became aware of such Disciplinary Proceeding or subpoena.

5.  Notice required for Emergence Remediation Coverage

If, during the **Policy Period**, a **Pollution Incident** occurs, then as a condition precedent to the **Insured's** right to coverage under this policy for Emergency Remediation Coverage for **Cleanup Costs** under SECTION IV – COVERAGE EXTENSIONS 1. Emergency Remediation Coverage, the **Insured** must immediately:

a.  record the specifics of the **Pollution Incident**, including how and when it took place, as well as details regarding the **Real Estate Development Service** provided;

b.  record a detailed description of the nature, scope and estimated amount of the **Cleanup Costs**; and

c.  notify the **Insurer** in writing as soon as practicable but in no event after the **Policy Period**.

6.  Notices

All written notices required herein must be sent to the **Insurer** at the **Insurer's** physical address or e-mail address shown in Item 9 of the Declarations.

C.  Multiple Wrongful Acts, **Claims** or Claimants

Two or more **Claims** arising out of a single **Wrongful Act**, or any series of related **Wrongful Acts**, will be considered a single **Claim**.  Each **Wrongful Act**, in a series of related **Wrongful Acts**, will be deemed to have occurred on the date of the first such **Wrongful Act.**

D.  Organizational Changes

1.  If, during the **Policy Period**:

a.  the **Named Insured** or any **Subsidiary** are merged with, consolidated into or acquired by or with another entity such that the **Named Insured** is not the surviving entity; or

b.  a receiver, conservator, trustee, liquidator or rehabilitator, or any similar official is appointed for or with respect to the **Named Insured** or any **Subsidiary**; then

coverage under this policy will continue in full force and effect with respect to **Real Estate Development Services** rendered before such event, but coverage will cease with respect to **Real Estate Development Services** committed after such event.  After any such event, this policy may not be canceled by the **Named Insured** and the entire premium for this policy will be deemed fully earned.

2.  If, during the **Policy Period**, the **Named Insured** or any **Subsidiary** merges, consolidates or acquires an entity whose gross revenues for the prior year are equal to or greater than 50% of the annual gross revenues of the **Named Insured** as reflected in the **Named Insured's** most recent consolidated financial statement prior to such merger, consolidation or acquisition, then no coverage will be afforded under this policy for any **Claim** involving such assets or entity unless the following conditions are met:

a.  The **Named Insured** provides written notice of such merger, consolidation creation, or acquisition to the **Insurer** within 60 days after the effective date of such merger, consolidation, creation or acquisition, or by the end of the **Policy Period**, whichever is earliest;

b.  The **Named Insured** provides the **Insurer** with such information as the **Insurer** may deem necessary;

c.  The **Named Insured** accepts any special terms, conditions, exclusions or additional premium charge as may be required; and

d.  The **Insurer**, at the **Insurer's** sole discretion, agrees to provide such coverage.

E.  Other Insurance

This insurance will apply only as excess of the applicable Deductible amount shown in Items 4 and 5 of the Declarations and the amount of any other valid and collectible insurance available to any **Insured** whether such other insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such other insurance is specifically written as excess insurance over the Limits of Liability provided in this policy.

F.  Cancellation and Non-Renewal

1.  Cancellation

a.  The **Named Insured** may cancel this policy by mailing or delivering advance written notice to the **Insurer** at the **Insurer's** address shown in Item 9 of the Declarations, stating when cancellation will be effective.  If the **Insured** cancels this policy, the **Insurer** will retain the customary short rate portion of the premium.

b. The **Insurer** may cancel this policy by mailing written notice to the first **Named Insured** shown in Item 1 of the Declarations stating when, not less than 30 days thereafter (or such longer period of time as required by applicable law), such cancellation will be effective.

c. However, if the **Insurer** cancels this policy because the **Named Insured** has failed to pay a premium or Deductible when due, the **Insurer** may cancel this policy by mailing written notice of cancellation to the first **Named Insured** shown in Item 1 of the Declarations stating when, not less than 10 days thereafter (or such longer period of time as required by applicable law), such cancellation will be effective.  Such notice will apply to all of the **Insureds**.  If cancelled by the **Insurer**, earned premium will be computed pro rata.

2. Non-renewal

If the **Insurer** elects not to renew this policy, the **Insurer** will mail to the first **Named Insured** shown in Item 1 of the Declarations written notice of non-renewal at least 60 days prior to the expiration date of this policy.  If the notice is not given at least 60 days prior to the expiration date, the policy will continue in force until 60 days after the notice of intent not to renew is received by the **Insured**.

Notice of non-renewal will not be required if the **Named Insured** has obtained replacement coverage or have requested or agreed to non-renewal.

G.  Subrogation

In the event of any payment under this policy, the **Insurer** will be subrogated to all the **Insured's** rights of recovery against any person or organization; provided that the **Insurer** will not exercise any rights of subrogation against any of the **Insureds** who did not commit the wrongdoing.

The **Insured** will execute and deliver instruments, papers, and do whatever else is necessary to secure such rights, and do nothing to prejudice such rights.

Any amount recovered upon the exercise of such rights of subrogation will be applied as follows: first, to the repayment of expenses incurred in recovery by exercise of such subrogation rights; second, to **Loss** paid by the **Insured** in excess of the limits of liability; third, to **Loss** paid by the **Insurer**; fourth, to **Loss** paid by the **Insured** in excess of the deductible amount; and last, to the repayment of any deductible amount paid by the **Insured**.

Notwithstanding the above, the **Insurer** hereby waives such subrogation rights against any **Insured** under this policy, and also against any client of the **Insured**, to the extent that the **Insured** had, prior to any **Claim** or circumstance that might reasonably be expected to be the basis of a **Claim**, a written agreement to waive such rights, provided that prior to such writing no **Insured** had a basis to believe that any matter asserted in such **Claim** or circumstance might reasonably be expected to be the basis of a **Claim**. In no event will any **Insured** waive any of its rights of subrogation after it has become aware of any **Claim**, or any circumstances that may give rise to a **Claim**, against any **Insured**.

H.  Bankruptcy or Insolvency

Bankruptcy or insolvency of any **Insured** or of any **Insured's** estate will not relieve the **Insurer** of any of the **Insurer's** obligations or deprive the **Insurer** of any of the **Insurer's** rights under this policy.

I.   Policy Territory

This policy applies to **Wrongful Acts** occurring anywhere in the world where legally permissible; however, no coverage will be available under this policy for any **Claim** brought, or occurring in any country with which the United States of America does not have active diplomatic relations at the time such **Claim** is made.

All premiums, Limits of Liability, deductibles and other amounts under this policy are expressed and payable in the currency of the United States of America.  If judgment is rendered, settlement is denominated or another element of **Loss** under this policy is stated in a currency other than United States Dollars, payment under this policy will be made in United States Dollars at the rate of

exchange on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

J. Assignment

Neither this policy nor any **Insured's** interest in this policy may be assigned without the **Insurer's** written consent.

K. Liberalization

If the **Insurer** adopts any revision to this form that would broaden coverage under this policy without additional premium at any time during the **Policy Period**, the broadened coverage will immediately apply to this policy, except that it will not apply to **Claims** that were first made against any **Insured** prior to the effective date of such revision.

L. Policy Changes

Notice to or knowledge possessed by any broker or other person acting on the **Insured's** behalf will not effect a waiver or change in any part of this policy or prevent or estop the **Insurer** from asserting any right(s) under this policy.  This policy can only be altered, waived or changed by written endorsement or agreed to in writing by an authorized representative of the **Insurer**.

M. Action Against the **Insurer**

No action can be brought against the **Insurer** unless, as a condition precedent, the **Insured** has fully complied with all the terms and conditions of this policy.  Nothing contained in this policy gives any person or organization the right to join the **Insurer** as a party to any **Claim** to determine the **Insured's** liability.

N. Waiver

The **Insurer's** failure to insist on strict compliance with any of the terms or conditions of this policy or the failure to exercise any right or privilege will not operate or be construed as a waiver of any subsequent breach or a waiver of any other terms, conditions, privileges or rights.

O. Representations

By accepting this policy, all **Insureds** agree that all statements made and information furnished to the **Insurer** are true, accurate and complete, and that this policy has been issued in reliance upon the truth and accuracy of those representations, subject to all of the terms and conditions of this policy.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SERVICE OF SUIT

If service of process is to be made upon the Company by way of hand delivery or courier service, delivery should be made to the Company's principal place of business:

Claims Manager
  Colony Insurance Company,
  Colony Specialty Insurance Company, or
  Peleus Insurance Company
  8720 Stony Point Parkway, Suite 400
  Richmond, Virginia 23235

If service of process is to be made upon the Company by way of the U.S. Postal Service, the following mailing address should be used:

General Counsel
  Colony Insurance Company,
  Colony Specialty Insurance Company, or
  Peleus Insurance Company
  P.O. Box 469011
  San Antonio, Texas 78246

Where required by statute, regulation, or other regulatory directive, the Company appoints the Commissioner of Insurance, or other designee specified for that purpose, as its attorney for acceptance of service of all legal process in the state in any action or proceeding arising out of this insurance.

The Commissioner or other designee is requested to forward process to the Company as shown above, or if required in his/her particular state, to a designated resident agent for service of process.


ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PROFESSIONAL SERVICES ENDORSEMENT

This endorsement modifies insurance provided under the following:

PROFESSIONAL LIABILITY COVERAGE

The definition of **Professional Services**, within SECTION III – DEFINITIONS, is amended by the addition of the following:

providing asset management, property management, development consulting, and those services as defined in the  Real Estate Developers PROtect? Professional Liability Insurance with Cyber Coverage Form, with respect to both acquired and non-acquired properties as well as owned and non-owned properties

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# RETROACTIVE DATE FOR SPECIFIC COVERAGE

This endorsement modifies insurance provided under the following:

    PROFESSIONAL LIABILITY COVERAGE

ITEM 8. Retroactive Date, as shown in the Declarations, is deleted and replaced with the following:

ITEM 8. RETROACTIVE DATE

| COVERAGE | RETROACTIVE DATE |
|---|---|
| **A.  Real Estate Development services & General Construction services** | **8/1/2018** |

    ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



# Privacy Policy

Argo Group US, Inc. ("Argo Group") recognizes the importance of maintaining the privacy of our customers and the confidentiality of each individual's nonpublic personal information, including Social Security numbers.  We take seriously the responsibility that accompanies our collection of nonpublic personal information, including Social Security numbers.  Accordingly, Argo's corporate policy is to protect the privacy and confidentiality of our consumers and their nonpublic personal information as required by law.

## Information Collection and Use

In order to conveniently and effectively provide and service the insurance products we sell, we may collect and use Social Security numbers and other nonpublic personal information.  As such, this policy does not prohibit the collection or use of Social Security numbers and nonpublic personal information where legally authorized and/or required.  This policy complies with the requirements of the Gramm-Leach-Bliley Act (GLBA) and applicable federal and state laws and regulations implementing the act.  Such laws impose certain obligations upon third persons and organizations with which we share nonpublic personal information of our consumers, customers, former customers, or claimants. Accordingly, we prohibit the unauthorized disclosure of Social Security numbers and other protected nonpublic personal information, except as legally required or authorized.

## Information Sharing and Disclosure

Argo Group does not rent, sell or share your personally identifiable information with nonaffiliated third parties. Argo Group may, however, share personally identifiable information with third-party contractors. These third-party contractors are prohibited from using the information for purposes other than performing services for Argo Group.  Argo Group may disclose your information to third parties when obligated to do so by law and to investigate, prevent, or take action regarding suspected or actual prohibited activities, including but not limited to fraud and situations involving the security of our operations and employees.

Finally, Argo Group may transfer information, including any personally identifiable information, to a successor entity in connection with a corporate merger, consolidation, sale of all or a portion of its assets, bankruptcy, or other corporate change.

## Security

In order to protect your nonpublic personal information, we limit access to nonpublic personal information by only allowing authorized personnel to have access to such information. Furthermore, we maintain physical, electronic and procedural security protections to safeguard the nonpublic personal information in our records.  Documents that contain an individual's protected information are destroyed before disposal; this destruction process includes the shredding of print and disposable media and deletion of electronic media.  Argo Group has security measures in place to protect the loss, misuse and alteration of the information under our control. Our hardware infrastructure is housed in a controlled access facility that restricts access to authorized individuals. The network infrastructure is protected by a firewall and traffic is monitored and logged both on the firewall and servers. Sensitive administrative activities are carried out over secure, encrypted links between our offices and hosting facility. Administrative

access is limited not only to authorized employees but also to specific remote administration protocols and IP addresses. All employees with access to personally identifiable information have been advised of Argo Group's security policies and practices. Argo Group will continue to conduct internal audits of its security systems and make all necessary enhancements to ensure the safety of the website and its users. No method of transmission over the Internet or method of electronic storage is 100% secure; therefore, while Argo Group uses commercially acceptable means to protect your information, we cannot guarantee absolute security.

Any Argo Group employee who becomes aware of the inappropriate use or disclosure of Social Security numbers and other protected nonpublic personal information is expected to immediately report such behavior to the General Counsel for further action.

**Corrected/Updated Information**

This policy applies to certain insureds of Argo Group, including but not limited to worker's compensation claimants.  If you have any questions about this Privacy Policy, please contact:

General Counsel
Argo Group US, Inc.
P.O. Box 469011
San Antonio, Texas 78246
(210) 321-8400

*Note: Argo Group is the parent of Argonaut Insurance Company; Argonaut-Southwest Insurance Company; Argonaut-Midwest Insurance Company; Argonaut Great Central Insurance Company; Argonaut Limited Risk Insurance Company; ARIS Title Insurance Corporation; Select Markets Insurance Company; Colony Insurance Company; Colony Specialty Insurance Company; Peleus Insurance Company (fka Colony National Insurance Company); Rockwood Casualty Insurance Company; Somerset Casualty Insurance Company; Grocers Insurance Agency, Inc.; Central Insurance Management, Inc.; Alteris Insurance Services, Inc.; Trident Insurance Services, LLC; Commercial Deposit Insurance Agency, Inc.; Sonoma Risk Management, LLC; John Sutak Insurance Brokers, Inc.; Colony Management Services, Inc.; Argonaut Management Services, Inc.; and Argonaut Claims Management, LLC.  This Privacy Policy applies to all companies and business produced or underwritten within Argo Group.

# SIGNATURE PAGE

IN WITNESS WHEREOF, the company issuing this policy has caused this policy to be signed by its President and its Secretary and countersigned (if required) on the Declarations page by a duly authorized representative of the company. This endorsement is executed by the company stated in the Declarations.

Colony Insurance Company

**President**                    **Secretary**