# Holland & Knight

31 West 52nd Street | New York, NY 10019 | T 212.513.3200 | F 212.385.9010
Holland & Knight LLP | www.hklaw.com


Mitchell J. Geller
(212) 513-3483
mitchell.geller@hklaw.com


BY OVERNIGHT COURIER AND E-MAIL

July 17, 2018

Bob G. Goldberg, Esq.
Meister Seelig & Fein LLP
125 Park Avenue, 7th Floor
New York, New York 10017

      Re: <u>Interests of Schneider/Schwartz Group in Limited Liability Companies</u>

Dear Mr. Goldberg:

      We represent Jerome Schneider, Ruth Schneider, Marc Schneider, Marni Schwartz, the Jerome Schneider 2012 Family Trust dated December 10, 2012 ("Jerome Schneider Trust") and the Ruth Schneider 2012 Family Trust dated December 10, 2012 ("Ruth Schneider Trust")(collectively the "Schneider/Schwartz Group") in connection with their respective interests in Rudel Realty LLC, Marni Realty LLC, RIS Realty LLC, Marc Realty LLC, Bar-Mar Realty LLC, SIR Realty LLC, Jeruth Realty LLC, Bren-El Realty LLC, JHJ Realty LLC and Zizi Realty LLC (collectively "LLC's"), each a New York limited liability company.

      The purpose of this letter is to advise you of claims by the Schneider/Schwartz Group against Pine Management, Inc. ("Pine") and those affiliated with Pine arising from Pine's management of the LLC's. As shown below, our examination of the 1996 Operating Agreements of Rudel Realty LLC and Marni Realty LLC ("1996 Operating Agreement"), the 2011 Amended and Restated Operating Agreements for the other eight LLC's ("2011 Amended Operating Agreement") and the relevant documents, including various e-mails and documents reflecting the revenue and expenses of the underlying properties held by the LLC's, [arguably] show, among other things, that: (a) Pine has breached its fiduciary duty to the Schneider/Schwartz Group and has not acted in good faith; (b) Pine has breached provisions of the governing Operating Agreements; (c) Pine has failed to disclose material facts to the Schneider/Schwartz Group; (d) Pine has been involved in related party transactions; and (e) Pine has failed to provide key documents concerning the management and operations of the LLC's to the Schneider/Schwartz Group.

      Indeed, the facts demonstrate that Pine and individuals associated or affiliated with Pine have kept the Schneider/Schwartz Group "in the dark" concerning certain key facts and documents concerning Pine's management of the LLC's, has oppressed the Schneider/Schwartz Group and

Bob G. Goldberg, Esq.
July 17, 2018
Page 2

has done everything in their power to entrench themselves and to exclude the Schneider/Schwartz Group from exercising their rights as members of the LLC's, in many of which they have a 50% interest.

Nothing better exemplifies Pine's attempt to oppress the Schneider/Schwartz Group and to entrench Pine's management of the LLC's than their attempt to amend the operating agreements to include a provision that "any Manager may be removed at any time, with or without cause, *by the unanimous vote of the members if the Manager hereunder is Pine Management, Inc., Harold Pine, any descendant of Harold and Sydell Pine, or any spouse of any such descendant.*" (Emphasis added). The sole and clear purpose of such an amendment is to prevent the Schneider/Schwartz Group from removing Pine, Harold Pine or any descendant of Harold and Sydell Pine or any spouse thereof, including Harold Pine, Brenda Rohlman, Daniel Rohlman, Jason Rohlman, Ilyse Rohlman, Lloyd Pine and Tom Rohlman (the "Pine/Rohlman Group"), from management of the LLC's. In short, the only purpose of such provision was to make Pine the Manager of the LLC's in perpetuity. Given the serious issues arising from Pine's management of the LLC's described below, the inclusion of such a provision would not only further entrench Pine in the management of the LLC's but result in further exclusion of the Schneider/Schwartz Group in the LLC's.

Before we address Pine's breaches of the Operating Agreements, Pine's breaches of fiduciary duty and Pine's self-dealing, we believe that it is instructive to set forth certain key principles that govern the management of limited liability companies. We include this detailed examination of New York law on a member's claims against a manager or managing member and a member's rights under the New York Limited Liability Company Law ("LLCL") to expedite your analysis of our clients' claims and to bring about a mutually satisfactory resolution of these claims without having to commence litigation that would be costly to all parties involved. At the very least, based on the detailed exposition of New York law, the facts and the issues, there are many serious issues arising from Pine's management of the LLC's and such claims should survive a motion to dismiss and a motion for summary judgment.

### I. Principles Applicable To The Management Of A Limited Liability Company And Claims Against The Manager

The LLCL governs limited liability companies formed under New York law. The terms of the operating agreement determine the rules applicable to the rights, management and operations of that limited liability company. *See Matter of 1545 Ocean Avenue, LLC*, 72 A.D.3d 121, 128 (2d Dep't 2010). The operating agreement also governs the relationships among members and the powers and authority of the members and manager. *See LNYC Loft, LLC v. Hudson Opportunity Fund I, LLC*, 154 A.D.3d 109 (1st Dep't 2017). Where an operating agreement does not address certain topics, a limited liability company is bound by the default requirements set forth in the LLCL. *1545 Ocean Avenue*, 72 A.D.3d at 129; *Manitaras v. Beusman*, 56 A.D.3d 735, 736 (2d Dep't 2008).

Bob G. Goldberg, Esq.
July 17, 2018
Page 3

### A. Claims Against Manager or Managing Member For Breach of Fiduciary Duty

LLCL § 409 (a), which imposes a statutory fiduciary duty on managers of limited liability companies, provides:

> A manager shall perform his or her duties as a manager, including his or her duties as a member of any class of managers, in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.

Under New York law, a manager or a managing member of a limited liability company owes a fiduciary duty to the non-managing members of such entity. *See, e.g., DeBenedictis v. Malta,* 140 A.D.3d 438 (1st Dep't 2016); *Pokoik v. Pokoik,* 115 A.D.3d 428, 429-432 (1st Dep't 2014). This fiduciary duty is a "duty of undivided and undiluted loyalty" and "is a sensitive and inflexible rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Birnbaum v. Birnbaum,* 73 N.Y.2d 461, 466 (1989). A manager also owes a member a "fiduciary duty to make full disclosure of all material facts." *Salm v. Feldstein,* 20 A.D.3d 469, 470 (2d Dep't 2005).

In *Bookhamer v. I. Karten-Bermaha Textiles Co., L.L.C.* 52 A.D.3d 246, 246 (1st Dep't 2008), the Appellate Division, citing *Birnbaum v. Birnbaum,* stated that the fiduciary duty required the 50% managing member "to operate the company in good faith and fairness, to avoid self-dealing and to make full disclosure of all material facts." *See also Nathanson v. Nathanson,* 20 A.D.3d 403, 404 (2d Dep't 2005) (allegations that manager engaged in self-dealing sufficient to state a cause of action for breach of fiduciary duty); *Sherman v. Mulerman,* 58 Misc.3d 1211(A) (Sup. Ct. Kings Co., Jan. 18, 2018) (allegations of defendant's self-dealing and freezing plaintiff out of decision making process sustained).

The 2011 Amended Operating Agreement of eight of the LLC's expressly recognizes the fiduciary duty owed by the Manager to the Members. Indeed, Section 17.2 states that "[n]otwithstanding anything otherwise herein contained to the contrary, *no provision set forth in this Agreement shall negate the fiduciary obligation and duty owed by the Manager to the Members.*" (Emphasis added).

In short, under New York law, a manager or managing member of a limited liability company can be held liable for breach of fiduciary duty where it commits acts that are contrary or inconsistent with his "duty of undivided and undiluted loyalty," fails to disclose material facts, or engages in misconduct or self-dealing.

### B. Conflicts Of Interest Under The LLCL

A manager of an LLC is bound by LLCL § 411, which addresses conflicts of interest by an LLC decision maker. *See Tzolis v Wolff,* 39 A.D.3d 138, 145-46 (1st Dep't 2007) ("Limited

Bob G. Goldberg, Esq.
July 17, 2018
Page 4

Liability Company Law § 411 disallows a transaction between a limited liability company and one or more of its managers, or with another business entity in which one or more of its managers has a substantial financial interest."), *aff'd*, 10 N.Y.3d 100 (2008).

C. Member's Inspection Rights Under LLCL

LLCL § 1102(b) grants inspection rights to a member of a New York limited liability company:

> Any member may, subject to reasonable standards as may be set forth in, or pursuant to, the operating agreement, inspect and copy at his or her own expense, for any purpose reasonably related to the member's interest as a member, the records referred to in subdivision (a) of this section, *any financial statements* maintained by the limited liability company for the three most recent fiscal years *and other information regarding the affairs of the limited liability company as is just and reasonable.* (Emphasis added).

Under LLCL § 1102(b), a court can direct the manager of the limited liability company to provide "any financial statements maintained by the limited liability company for the three most recent fiscal years" and "other information regarding the affairs of the limited liability company as is just and reasonable."

We note that Section 14.1 of the 2011 Amended Operating Agreement for eight (8) of the LLC's provides:

> The manager shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office. *Each Member*, Manager or their duly authorized representative *shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.* (Emphasis added).

Thus, the inspection rights to examine the "Company's books and records" under Section 14.1 of the 2011 Amended Operating Agreement are broader than the inspection rights under LLCL § 1102(a) and includes all types of documents with respect to the LLC's. The courts have uniformly enforced a member's inspection rights under LLCL § 1102(b) and the governing operating agreement. *See, e.g., Sachs v. Adeli*, 26 A.D.3d 52, 55-57 (1st Dep't 2005); *Greenberg v. Falco Construction Corp.*, 29 Misc.3d 1202(A), 2010 WL 3781279, *7 (Sup. Ct. Kings Co. Sept. 29, 2010).

Bob G. Goldberg, Esq.
July 17, 2018
Page 5

D.   Claim For An Accounting

New York law holds that a member of a limited liability company has the right to an equitable accounting under common law. *See Gottlieb v. Northriver Trading Co LLC*, 58 A.D.3d 550, 551 (1st Dep't 2009); *East Quogue Jet LLC v. East Quogue Members, LLC*, 50 A.D.3d 1089, 1091 (2d Dep't 2008); *Gallagher v. Crotty*, 2017 WL 3314241, **2, 4 (Sup. Ct. New York Co., Aug. 3, 2017).

II.  **Schneider/Schwartz Group's Claims Against Pine**

We now address the Schneider/Schwartz Group's claims against Pine arising from Pine's management of the LLC's. These claims broadly fall into four categories:

(1)   Pine's management of eight of the LLC's without obtaining the written approval of the Schneider/Schwartz Group of the "agreement" with the "property manager" and Pine's management of Marni Realty LLC and Rudel Realty LLC when the 1996 Operating Agreement (Section 5.1) provides that that "the business and affairs of the Company shall be managed by the Members." This claim also includes Pine's payment of fees to itself without obtaining the approval of the Schneider/Schwartz Group and Pines' self-dealing;

(2)   Pine's making of decisions which are outside the "ordinary course of business" and therefore require the approval of the Schneider/Schwartz Group such as (a) the setting of cash reserves that are a departure from historical practices of the LLC's or that are in excess of what is required for day to day operations, (b) the making of capital improvements that are not required for health or safety purposes and (c) the incurring of loans relating to the buildings owned by the LLC's;

(3)   Pine's decision to substantially reduce the distributions from the LLC's to the members without the approval of the Schneider/Schwartz Group, which reduction is a material change in the historical practice of significant distributions to the members of each of the LLC's; and

(4)   Pine's failure to produce certain documents requested by the Schneider/Schwartz Group or to provide explanations of amounts appearing in documents produced.

A.   Pine's Management Of Eight Of The LLC's Without Obtaining
     The Approval Of The Schneider/Schwartz Group Of The
     "Agreement" With The "Property Manager"

Section 8.1(c) of the 2011 Amended Operating Agreements states as follows:

> The Company's *initial manager* shall be Pine Management Inc. Pine Management, Inc. *may be paid for services rendered in* its role as

Bob G. Goldberg, Esq.
July 17, 2018
Page 6

> *property manager pursuant to a separate agreement with the Company.*" (Emphasis added).

Although the members of each of the eight limited liability companies that adopted the 2011 Amended Operating Agreement agreed that Pine would be the "initial" Manager of each such entity, the "separate agreement with the property manager" is not annexed to each 2011 Amended Operating Agreement. Significantly, our clients advise us that they have never seen the "separate agreement" with the Pine as "property manager" and certainly never approved the "separate agreement."

Moreover, the "separate agreement" with Pine as "property manager" requires the "affirmative vote of a majority in interest of the Members." In addition, the Pine/Rohlman Group cannot vote on the "separate agreement" with Pine as the "property manager" because they are "interested" or "affiliated" with Pine and thus cannot vote on their own agreement. Here, the Schneider/Schwartz Group was never presented with a copy of the "separate agreement" with the "property manager," and thus was not and is not aware of the terms of such "separate agreement," including, but not limited to, the terms of compensation paid to Pine as the "property manager." As a result, the Schneider/Schwartz Group would have the power to disallow or terminate the "separate agreement" with Pine as the "Property Manager" if in fact such an agreement had been executed. See LLCL § 411.

Particularly instructive is *Tzolis v. Wolff*, 39 A.D.3d 138, 145-146 (1st Dep't 2007), *aff'd*, 10 N.Y.3d 100 (2008), where the First Department sustained claims by minority members of a limited liability company, holding:

> *In any event, regardless of whether a majority, two-thirds, or a unanimous vote was required, Limited Liability Company Law § 411 disallows a transaction between a limited liability company and one or more of its managers, or with another business entity in which one or more of its managers has a substantial financial interest. Therefore, plaintiffs have alleged a viable cause of action which the documentary evidence does not refute.* (Emphasis added).

The same result was reached in *Meyer v. Montauk U.S.A., LLC*, 2017 WL 6387947 (Sup. Ct. Suffolk Co., May 9, 2017). There, the manager asserted that he had authority under the operating agreement to approve an agreement with the limited liability company under which he assigned certain revenues from a licensing agreement to himself. The Supreme Court rejected the manager's contentions and deemed the licensing agreement void, invalid and of no force and effect. *Id.* at **5-6.

The foregoing cases show that courts will closely scrutinize contracts between a limited liability company and a business entity in which its manager has an interest and that such contracts will be disallowed. Simply put, the Pine/Rohlman Group or Pine itself cannot approve the "separate agreement" with Pine as the "property manager." Given Pine's utter failure to produce

the "separate agreement" and Pine's failure to submit the "separate agreement" to the Schneider/Schwartz Group, let alone obtain its approval, the "separate agreement" with Pine has no validity.

In the case of Marni Realty LLC and Rudel Realty LLC, the 1996 Operating Agreement does not appoint Pine Management as the "Manager" or as the "Property Manager." Assuming that Pine Management has been *de facto* serving as the "Manager" and the "Property Manager" for these two entities for the last several years, the Jerome Schneider Trust and the Ruth Schneider Trust (that collectively own 50%), under Section 5.1 of the 1996 Operating Agreement, have the right to "co-manage" these entities. As a result, Pine has no entitlement to serve as the "Manager" or the "Property Manager" and Marni Realty LLC and Rudel Realty LLC.

    (1)    Pine Has No Authority To Pay Itself Fees Without
              The Approval of the Schneider/Schwartz Group

Furthermore, Pine has no authority to pay itself fees without the approval of the Schneider/Schwartz Group, who has a 50% interest in five of the LLC's, a 25% interest in three of the LLC's, and a 33% interest and a 30% interest in the remaining two LLC's. The "Summary of Receipts and Disbursements 12/31/17" produced by Pine for the LLC's indicate that Pine is paid a "management fee" and a "construction management fee." The "Building P&Ls" indicate that "Total Management Fees" of $622,742 were paid to Pine in 2017 for the LLC's excluding Bar-Mar Realty, LLC.

Suffice it to say, Pine has no authority under the 2011 Amended Operating Agreement to fix its own compensation. Indeed, Section 8.10 of the 2011 Amended Operating Agreement, in clear and unambiguous language, indicates that the "the guaranteed payments and other compensation of the Manager, if any," must be approved "by the affirmative vote of a majority in interest of the Members." Thus, Pine cannot receive any "compensation" for its services unless approved by the vote of more than 50% of the members of the limited liability companies, without taking into the vote of the "interested" members. Given that the Schneider/Schwartz Group has never voted on the "compensation" of Pine, let alone approved such "compensation," Pine has no right to receive fees for its services in connection with its management of the LLC's.

This conclusion equally applies to the 1996 Operating Agreement of Marni Realty LLC and Rudel Realty LLC which contain no provision for the compensation of Pine or any other member involved in managing such entities. Given that Section 5.01 of the 1996 Operating Agreement provides that that "the business and affairs of the Company shall be managed by the Members," the "Members" of Marni Realty LLC and Rudel Realty LLC must approve any compensation paid to a "Manager."

Furthermore, Pine has no authority under the LLCL to fix its own compensation. *See Bookhamer v. I. Karten -Bermaha Textiles, Co. L.L.C.*, 2007 WL 6787899 (Sup. Ct. New York Co. Mar. 29, 2007), *aff'd,* 52 A.D.3d 246 (1st Dep't 2008) (rejecting defendant's claim that his 50% stake in the company gave him authority to fix his compensation, and finding that § 411(b)

Bob G. Goldberg, Esq.
July 17, 2018
Page 8

"require[d] the issue of compensation to have been decided by a majority of the members of Bermaha, and not by defendant alone.").

B. Pine's Making of Decisions Outside The "Ordinary Course of Business" Without Obtaining The Approval Of The Schneider/Schwartz Group

Section 8.3 of the 2011 Amended Operating Agreement provides that "[t]he Manager shall be responsible for supervision and general management of the business and day-to-day operations of the Company in the ordinary course of business; *provided, however, that decisions which are outside the ordinary course of business, including but not limited to decisions to finance or refinance any real estate owned by the Company, acquire new or additional real estate, or sell any real estate owned by the Company shall be made by the affirmative vote of a majority in interest of the Members.*"(Emphasis added).

By an e-mail dated February 19, 2018 to Marc Schneider, you stated that "The *only limitation provided in these agreements* is that decisions to finance or refinance any real estate owned by an LLC, acquire new or additional real estate, or sell any real estate owned by a LLC requires the affirmative vote of a majority in interest of the voting members or the affected LLC." (Emphasis added). However, your statement is contrary to the phrase "including, but not limited to" in Section 8.3, which are not words of limitation.

Equally significant, judicial authority uniformly holds that the phrase "including, but not limited to," has an expansive meaning and is not limited to the items that follow such phrase. *See e.g., Pierre v Providence Washington Ins. Co.*, 99 N.Y.2d 222, 236 (2002) ("includes, but is not limited to" constituted "nonexclusive definition"); *Doniger v Rye Psych. Hosp. Center, Inc.*, 122 A.D.2d 873, 877 (2d Dep't 1986), *lv denied,* 68 N.Y.2d 611 (1986) (use of phrase "including but not limited to" negated inference that parties intended to exclude other examples, and examples following phrase were "illustrative only and do not limit the broad scope of the terms employed"); *see also In re Worldcom, Inc.*, 2007 WL 162782, *6 (S.D.N.Y., Jan. 18, 2007) (phrase "including without limitation" means that following list is not exhaustive); *Fernandez v. Zoni Language Centers, Inc.*, 15-cv-6066 (PKC), 2016 WL 2903274. *6 (S.D.N.Y. May 18, 2016) (same).

Thus, your position that "outside the ordinary course of business" is "limited to decisions to finance or refinance any real estate owned by the Company, acquire new or additional real estate, or sell any real estate owned by the Company" has no factual or legal basis.

Decisions that are "outside the ordinary course of business" in the case of these LLC's and therefore "require the affirmative vote of a majority in interest of the Members" (more than 50% of the Members) include the following: (1) capital improvements that are not required for health or safety purposes; (2) setting of cash reserves that are a departure from historical practices of the LLC's or that are in excess of what is required for day to day operations; and (3) a material change in the historical practice of significant distributions to the members of each of the LLC's. We

Bob G. Goldberg, Esq.
July 17, 2018
Page 9

understand that there has been a dramatic increase in the amount of reserves and capital improvements or renovations for each of the properties owned by the LLC's.

In *Unisys Corp. v. Hercules Inc.*, 224 A.D.2d 365, 368 (1st Dep't 1996), the Appellate Division held that "something which is done as a matter of corporate historical practice is, as a matter of law, done 'in the ordinary course of business.'" Black's Law Dictionary (10th ed. 2014) similarly defines "course of business" as "the normal routine in managing a trade or business." Thus, historical practice is a key indicator of "ordinary course of business." There is no dispute as to the historical practice of these LLC's. The dramatic increase of cash reserves and capital improvements, together with the dramatic decrease in distributions, is contrary to the historical practice for the LLC's and thus, "outside the ordinary course of business."

Nonetheless, Pine has refused to let the Schneider/Schwartz Group participate in these matters that are "outside the ordinary course of business" and thus have to be approved by the affirmative vote of a majority in interest of the Members. Instead, Pine, without any legal basis, has unilaterally decided that these matters are solely within its decision-making authority.

As an example, the Schneider/Schwartz Group discovered in June 2018 that JHJ Realty LLC incurred loans in the total amount of $800,000, which loans were made by the Pine/Rohlman Group. Even based on your incorrect reading of Section 8.3 of the 2011 Amended Operating Agreements, these loans were outside the ordinary course of business and had to be approved by the affirmative vote of a majority in interest of the Members. Pine never sought the approval of the Schneider/Schwartz Group and we are unaware of any approval of such loans by the affirmative vote of a majority in interest of the Members of JHJ Realty LLC.

In addition to being significantly contrary to historical practice of the LLC's, the figures proposed by Pine for the amount of each building's reserve accounts appear to be excessive and unreasonable and far in excess of what is necessary for day to day operations. We understand that the average cash position for the years 2012-2016 is about 327% higher than the average cash position for the years 2000-2005 and that the cash position at the end of the year 2017 is about 393% higher than it was in 2000.

Although Brenda Rohlman's March 3, 2018 e-mail states that "over 35 years, Pine Management Inc. has developed guidelines as to how much money to hold in each building's reserve accounts," Pine has never produced these "guidelines."

C.   Pine's Decision To Substantially Reduce The Distributions
     From The LLC's To The Members Without The Approval
     Of The Schneider/Schwartz Group

We understand that distributions from the LLC's have been dramatically reduced. Indeed, it is our understanding that distributions from the LLC's, which were approximately $500,000 in 2011, decreased to approximately $125,000 in 2017. As noted, a material change in the historical practice of significant distributions to the members of each of the LLC's is a decision that is

Bob G. Goldberg, Esq.
July 17, 2018
Page 10

"outside the ordinary course of business" in the case of these LLC's and therefore "requires the affirmative vote of a majority in interest of the Members" (more than 50% of the Members).

It cannot be disputed that the amount of distributions received by a member is a matter of crucial importance to the members of the LLC's. Pine has no authority to unilaterally change the historical practice of significant distributions to the members. As a result, the decision to dramatically change the historical practice of significant distributions is a matter "outside the ordinary course of business" in the case of these LLC's and therefore requires the vote of the Schneider/Schwartz Group.

In the case of the 1996 Operating Agreement of Marni Realty LLC and Rudel Realty LLC, Pine has no authority to dramatically decrease the amount of distributions to the members. Inasmuch as the management of these two limited liability companies is vested in the two members pursuant to Section 5.01 of the 1996 Operating Agreement, the "Members" of Marni Realty LLC and Rudel Realty LLC (not Pine) must decide the issue of distributions.

D.  Pines' Failure To Produce Documents Requested By The
    Schneider/Schwartz Group Or To Provide Explanations
    Of Figures Appearing In Documents Produced

Section 14.1 of the 2011 Amended Operating Agreement for eight (8) of the LLC's provides:

> The manager shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office. Each Member, Manager or their duly authorized representative *shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.*

As noted, the inspection rights to examine the "Company's books and records" under Section 14.1 of the 2011 Amended Operating Agreement is broader than the inspection rights under LLCL § 1102(a). The member's "right to examine the Company's books and records" includes documents such as tax returns, financial statements, key contracts, ledgers and other documents concerning the financial condition of the limited liability company and the underlying property, including, but not limited to: (a) documents concerning capital improvements; (b) documents relating to or constituting the basis on which the Manager or Property Manager is setting reserves for the underlying property; (c) documents relating to payments to the Manager or Property Manager, and payments, if any, to related or affiliated parties of the Manager or Property Manager and (d) documents concerning or relating to loans to or by the limited liability company.

Based on the inspection rights of the Schneider/Schwartz Group as a member of the 8 LLC's under LLCL § 1102(a) and (b) and Section 14.1 of the 2011 Amended Operating

Agreement, we, on behalf of the Schneider/Schwartz Group, request that Pine produce the following documents for the last six (6) years (2012-2018):

    (1) the "separate agreement" between the respective limited liability company and Pine Management for services rendered as the "property manager" and any amendments thereto and documents constituting the approval of such "separate agreement;"

    (2) documents showing monies paid to Pine Management as the "Manager" of the respective limited liability company and the approval of monies paid or to be paid to the Manager;

    (3) documents showing monies paid to Pine Management as the "Property Manager" of the respective limited liability company, the approval of monies paid or to be paid to the Property Manager and the basis and methodology for the calculation of the "management fee" and "construction management fee;"

    (4) documents showing the "financial condition" of the limited liability company, including any Profit and Loss Statements, Balance Sheets, Accounts Receivable Journals, Accounts Payable Journals and General Ledgers;

    (5) documents showing the basis for the calculations for the amount of distributions to the members of the limited liability company;

    (6) documents showing the capital improvements to the property and payments relating to such capital improvements;

    (7) documents relating to or constituting the basis or methodology on which the Manager or Property Manager is setting reserves for the underlying property, including Pine Management's "guidelines," if any, for such reserve accounts:

    (8) documents constituting or relating to renovations to the apartments at the property;

    (9) documents concerning or related to payments by the respective limited liability company to persons or entities related or affiliated with Pine Management; and

    (10) Written consents, if any, reflecting actions taken by the Manager or Members of the LLC's.

Bob G. Goldberg, Esq.
July 17, 2018
Page 12

We, on behalf of Marni Realty LLC and Rudel Realty, LLC, request the same documents for these entities based on the provision that Section 5.1 of the 1996 Operating Agreement provides that "the business and affairs of the Company shall be managed by the Members" and the inspection rights under LLCL § 1102(a) and (b). At the very least, the "default provisions" of the LLCL apply where, as here, these Operating Agreements are "silent" on the issue.

The Schneider/Schwartz Group has requested a number of the foregoing documents. Pine has refused to produce certain requested documents. For example, Brenda Rohlman's March 3, 2018 e-mail refused the Schneider/Schwartz Group's "request for capital expenditures over the past five years for each apartment in the buildings you and your family has a membership interest in," stating "Pine Management Inc. is not spending the time to go backwards over the past five years to complete this list." Surely, the Schneider/Schwartz Group is entitled to this information which materially affects their interests in the LLC's. Surely, the Schneider/Schwartz Group is entitled to information concerning the "Management Fee" and the "Construction Management Fees" referenced in the "Summary of Receipts and Disbursements" of each of the LLC's" and the methodology used to arrive at such fees.

Surely, the Schneider/Schwartz Group is entitled to information concerning any loans to the LLC's, including, but not limited to, loans made to the LLC's by members of such LLC's, including the Pine/Rohlman Group. In particular, the Schneider/Schwartz Group is entitled to advance notification and approval of such loans.

Pine's refusal to produce the requested documentation is contrary to its fiduciary duty to provide material facts to the members of the LLC's.

We also note that Pine does not produce documents on a regular or timely basis to the Schneider/Schwartz Group. Rather, Pine produces certain documents in reaction to a request from the Schneider/Schwartz Group. A perfect example of Pine's release of information and documents "after the fact" is Pine's production of documents relating to the $800,000 of loans incurred during the period November 15, 2016 through December 1, 2017 by JHJ Realty LLC *after* Jerome Schneider sent an e-mail, dated June 13, 2018, to Tom Rohlman.[1]

"A manager's failure to provide access to books and records where an applicable state statute allows inspection can constitute a breach of fiduciary duty." *Estrada v. Dugow*, 2016 WL 7017412, *8 (S.D.N.Y. Nov. 30, 2016). If Pine refuses to permit the Schneider/Schwartz Group or its representatives to examine and make copies of the foregoing documents, the Schneider/Schwartz Group can commence an action, which will include a cause of action for inspection of the books and records of the LLC's (*see Sachs v. Adeli*, 26 A.D.3d at 55-57, *Neumann v. Cenpark Realty, LLC*, 2012 WL 10007764, **6-7 (Sup. Ct. N.Y. Co. Apr. 18, 2012), as well as a cause of action for an accounting. *See Gottlieb v. Northriver Trading Co LLC*, 58 A.D.3d at 551.

---

[1] The Notes comprising the $800,000 of loans are dated November 15, 2016, December 13, 2016, October 4, 2017 and December 1, 2017. The Harold Pine 2009 Family Trust is the lender on each of the Notes.

Bob G. Goldberg, Esq.
July 17, 2018
Page 13

*       *       *

The foregoing presentation demonstrates, among other things that: (a) Pine has breached its fiduciary duty to the Schneider/Schwartz Group and has not acted in good faith; (b) Pine has breached provisions of the governing Operating Agreements; (c) Pine has failed to disclose material facts to the Schneider/Schwartz Group; (d) Pine has been involved in related party transactions; and (e) Pine has failed to provide key documents concerning the management and operations of the LLC's to the Schneider/Schwartz Group. In short, Pine (and the Pine/Rohlman Group) have taken actions that have prevented the Schneider/Schwartz Group from exercising their rights as members under the 2011 Amended Operating Agreements, the 1996 Operating Agreement and the LLCL.

In view of the foregoing, we suggest that a meeting be scheduled to resolve the Schneider/Schwartz Group's concerns. We believe that a mutually satisfactory resolution of the issues is preferable to a costly and unnecessary litigation.

Sincerely,

*Mitchell J. Geller* (signature)

Mitchell J. Geller

cc: Jerome Schneider
    Ruth Schneider
    Marc Schneider
    Marni Schwartz
    Lance Myers, Esq.

#58894569.v.1